Prior to the initial hearing before Deputy Commissioner Shuping, the parties entered into a Pre-Trial Agreement, which is hereby incorporated by reference as if fully set out herein and where they agreed to a number of jurisdictional and other factual stipulations, including the attached medical and rehabilitation records. By subsequent Order thereof the parties were allowed a reasonable period of time to obtain, either by deposition at defendants expense or stipulated report, the medical evidence necessary to complete the record and have since deposed Dr. Andrew as well as the R. N. Case Manager previously involved, Rose K. Green.
The Full Commission has reviewed the prior Opinion and Award based on the Record of the proceedings before Deputy Commissioner Lawrence B. Shuping and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award.
* * * * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff is a right-handed, 42 year old married male with four children. He not only attended A T State University in Greensboro for a year and a half and was initially enrolled in the electrical engineering program before changing majors to political science, but attended technical school at Wake Tech for four years and obtained a machinist degree there.
2. Plaintiff worked for defendant-employer almost 20 years and by all accounts was an excellent employee. In July of 1974 he initially became employed there as a machine operator responsible for insuring that machines were properly operating, but a year later was reassigned to a job operating tumbling equipment, which was designed to debur the sharp edges of parts and materials after they had been run through punch press machines. Plaintiff was a tumbling operator for a year to a year and a half before going back to the machine operator's job and becoming a set up person responsible for setting up the dyes on the machine, which involved shoveling the dyes off a dye truck and putting them under the presses to be bolted down. Plaintiff did this job until 1980 when he was transferred to the tool-room as a machinist apprentice responsible for operating milling machines, lathes, drill presses and grinders not only requiring him to turn manual hand cranks on these machines, but as part of the same job involved the type of repetitive flexion and extension of the elbow that he can no longer do because of the permanent right arm injury giving rise hereto.
3. The involved occupational disease claim is one for compressive neuropathy of the ulnar nerve primarily affecting plaintiff's dominant right arm and to a lesser extent his left one due to the manner that he had to repetitively flex and extend his elbows in the course of the machinist job that he had done in the premises tool-room since 1980 operating various types of machinery there, which (disease or condition) is characteristic of and peculiar to the same trade, occupation or employment wherein, as compared to members of the general public and other jobs at large not similarly exposed to that type of flexion and extension of the elbow) there is an increased risk of developing the same disease or condition.
4. Plaintiff initially experienced problems with his dominant right arm in 1989 when he developed a work-related carpal tunnel syndrome requiring him to undergo corrective hand surgery on 5 January 1990. After recovering from surgery he returned to his regular machinist job in the premises tool-room and continued regularly working there until he developed a recurrence of problems with his dominant right arm and to a lesser extent his left arm due to the manner that he had to repetitively flex and extend his elbow in the course of his regular machinist's job resulting in compressive neuropathies affecting the ulnar nerve in both arms, but primarily his dominant right one, manifested by pain, numbness and tingling requiring him to return to the same orthopedic surgeon, Dr. Wallace Andrew, who performed his earlier carpal tunnel release.
5. Dr. Wallace initially attempted a conservative course of treatment involving splinting and then injection of the more severely affected dominant right hand and arm, but in April of the following year when plaintiff's condition had not improved performed corrective surgery in the nature of a transposition of the right ulnar nerve at the elbow designed to relieve nerve compression there as well as to prevent stretching of the same nerve.
6. Although having neither reached maximum medical improvement and/or the end of the healing period from and following his corrective elbow surgery and the occupational disease giving rise hereto nor then able to return to his regular machinist's job; by 14 April 1992 plaintiff had sufficiently recovered from the same surgery so as to be able to return light work, initially on a part-time, four hour a day basis, and defendant-employer was able to provide him suitable work in the premises tool crib handing out needed supplies and materials.
7. Despite continued pain, tingling and numbness in not only his dominant right arm, but to a lesser extent in his opposite arm whenever he used it frequently, plaintiff was ultimately able to return to the job in the tool crib on a full-time basis in September of 1993. Although he admittedly did not like the same job; plaintiff was physically capable of performing it and did until mid-February of the following year. Although the tool crib job paid a lower hourly rate; throughout the period of time that he worked in the tool crib, whether on a full or part-time basis, plaintiff continued to receive his full salary based on the wages that he would have earned had he been working as a machinist.
8. In the interim, on or about 11 November 1993 plaintiff reached maximum medical improvement and/or the end of the healing period from and following his disabling bilateral compressive ulnar neuropathies giving rise hereto, at which time Dr. Andrew released him from his care and as a result of the more severe compressive neuropathy affecting his dominant right hand and arm plaintiff sustained a twelve (12) percent permanent-partial disability of the upper right upper extremity and because of his permanent arm injury is unable to return to his regular machinist's job; but rather, only the light to medium employment within the lifting limitations described in the stipulated functional capacity evaluation of 31 August 1993 and does not involve repetitive flexion and extension of the elbow or results in intolerable discomfort; therefore, any potential job should be limited by his pain and should be avoided if the pain and discomfort becomes intolerable.
9. As previously stated, the tool crib job was only a temporary one that defendant offered to an injured employee during his period of rehabilitation from the involved injury because there was only ordinarily one employee in the tool-room and another one was not needed. Because he was unable to return to his regular machinist's job and the job in the tool crib was only a temporary one, when Dr. Andrew released plaintiff from his care in November of 1994 to return to regular work within the previously described limitations of his permanent right arm injury, including as part thereof, avoidance of repetitive work, defendant-employer engaged the services of a rehabilitation specialist to attempt to find plaintiff suitable alternate employment.
Many of the manufacturing positions in the plant involved dominant hand intensive labor, including repetitive motion for prolonged periods. The only potentially suitable jobs that the same rehabilitation specialist was able to identify were one as a spot welder, another on the paint line and still another in shipping and packing; however, the latter job would have required lifting up to 70 pounds occasionally and was clearly unsuitable. Of the other two, the spot welder's job not only required the use of pliers, but both hands; while the paint line job involved hanging metal boxes on a moving conveyor, which weighed up to 12 pounds and not only required both hands to lift, but involved the type of repetitive motion that plaintiff can no longer engage because of the bilateral compressive ulnar neuropathies giving rise hereto.
10. Plaintiff was not able to use his left hand to perform the latter paint line job because he neither had sufficient coordination to do so, but reasonably refused to because of experiencing the same type of pain, numbness and tingling in his left hand that he did in his right whenever he used it frequently.
11. Although plaintiff attempted to perform both jobs; he was unable to continue them because of his intolerable pain. When plaintiff could not perform either because of his intolerable pain; defendant-employer placed him on a "make" work job doing paperwork before ultimately placing him on a medical leave of absence on 24 March 1995 as a result of his no longer being able to perform any of the positions on the premises. Prior to his medical layoff plaintiff had sought to return to his original machine operator's job as well as another job in the CAD-CAM room; however, there were no available openings on the first job and according to his employer he did not have the necessary blueprint and computer work experience necessary to do the second.
12. On 8 March 1994 when Dr. Andrew last saw plaintiff and the case manager then assigned him, Rose Green, he not only recommended seeking employment elsewhere within his restrictions because of being unable to work at the available positions there; but felt that plaintiff might be a candidate for vocational rehabilitation or job retraining to utilize his background and experience. Defendant-employer, however, has never attempted to provide plaintiff with any type of vocational rehabilitation or retraining to enable him to return to suitable work within the limitations of his bilateral compressive ulnar neuropathies because of his inability to return to his regular machinist's job and the unavailability of suitable alternate employment on the premises.
13. After he was placed on medical layoff because of his inability to perform his regular machinist's job and the unavailability of other suitable positions, plaintiff on his own attempted to obtain suitable alternate work, but was unable to until September of that year and then only part-time work at Hallmark, where he worked 21 hours in September and six in October. The first of October he began another part-time job delivering newspapers an hour and a half each morning.
14. While plaintiff is entitled to compensation for his resulting partial disability based on two-thirds of the difference between the $574.00 average weekly wage that he was able to earn as a machinist at the time of becoming disabled by the occupational disease giving rise hereto and the part-time earnings that he has since been able to earn at Hallmark and delivering newspapers; any final award cannot be entered without evidence as to plaintiff's specific earnings since September of 1994, which the Full Commission assumes the parties can not only obtain from plaintiff's part-time employer's since September of 1994 and agree to stipulate; but stipulate as to the amount of the appropriate award that he is due for his resulting partial disability based on those same earnings without a further Opinion and Award. If they are unable to; either can request a further hearing before the Industrial Commission upon this limited issue.
15. To the extent defendant-employer now desires to engage the services of a vocational rehabilitation specialist to assist plaintiff in obtaining the type of suitable alternate work required by the occupational disease giving rise hereto on a full-time, rather than part-time basis, or the necessary job retraining to obtain higher paying employment, plaintiff is obligated to cooperate in any reasonable efforts in either regard or to have his benefits suspended until he does; however, there is no reason to believe he will not.
* * * * * * * * * * * * *
Based on the foregoing findings of fact the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Due to the manner that he had to repetitively flex and extend both elbows in the course of his regular machinist's job for defendant-employer plaintiff developed disabling bilateral compressive ulnar neuropathies requiring him to undergo corrective surgery to the more severely affected dominant right arm, which (disease or condition) is characteristic of and peculiar to the same employment, trade or occupation, but excluding all ordinary diseases to life to which the public is equally exposed outside of that employment. Thus, plaintiff has developed a compensable occupational disease pursuant to the provisions of G.S. § 97-53 (13).
2. As a result of the occupational disease giving rise hereto plaintiff was temporarily totally disabled from 24 March 1994 to 1 September 1994 entitling him to compensation at a rate of $382.69 per week during the same period. G.S. § 97-29.
3. As a result of the occupational disease giving rise hereto plaintiff became partially disabled on 1 September 1994 entitling him to compensation at a rate of two-thirds of the difference of the $574.00 average weekly wage he was able to earn at the time of developing the occupational disease giving rise hereto and the reduced average weekly wage he has been able to earn doing part-time work since 1 September 1994; provided, however, the same benefits are payable for a maximum of 300 weeks from the date of injury, which occurred on 1 April 1994 when plaintiff initially became disabled by the same injury on the date he was admitted for corrective surgery, subject to a credit for the temporary-total disability benefits paid between 24 March 1994 and 1 September 1994. As indicated in the above Findings of Fact, the Full Commission not only assumes that the parties can obtain and agree to stipulate the amount of plaintiff's part-time earnings since 1 September 1994, but stipulate as to the amount of appropriate award that he is due for his resulting partial disability based on those same earnings without a further Opinion and Award. If they are unable to; either can request a further hearing before the Industrial Commission upon this limited issue.
* * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay plaintiff, on account of his temporary-total disability, compensation at the rate of $382.69 per week during the period from 24 March 1994 to 1 September 1994 and thereafter compensation on account of his partial disability at a rate of two-thirds of the difference between the $575.00 average weekly wage he was able to earn at the time of his injury and the reduced average weekly wage that he has earned doing part-time work since 1 September 1994; provided, however, such compensation shall be payable for a maximum of 300 weeks from the 1 April 1993 date of injury when he initially became disabled by the involved injury, subject to a credit for the temporary-total disability benefits paid from 24 March 1994 to 1 September 1994. Such compensation having accrued the same shall be paid in lump sum, without commutation, subject to a reasonable attorney fee hereinafter approved.
2. At this time a reasonable attorney fee in the amount of twenty-five (25) percent of the accrued compensation benefits due under the above award is hereby approved for plaintiff's counsel, which shall be deducted from the same award and forwarded directly thereto. For the balance of his fee defendants shall forward every fourth compensation check payable hereunder directly to plaintiff's counsel.
3. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from and/or lessen the period of disability associated therewith defendants shall pay all reasonable and necessary medical expenses incurred by plaintiff as a result of the occupational disease giving rise hereto, including as part thereof the corrective surgery performed by Dr. Andrew, when bills for the same are submitted in accordance with the Industrial Commission Rules.
4. Defendants shall bear the costs.
 S/ _______________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _______________________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _______________________________ DIANNE C. SELLERS COMMISSIONER